IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MURIEL COLLINS                                  :
              Plaintiff,

          v.                                  :            CIVIL ACTION
                                                       NO. 12-2173

KIMBERLY-CLARK PENNSYLVANIA, LLC          :
              Defendant.

**<u>MEMORANDUM</u>**

**Jones, II   J.**                                                          **March 27, 2017**

I.      **Introduction**

      Plaintiff Muriel Collins, a long-term employee of Kimberly-Clark Paper Company, commenced this action against her employer, alleging agents of the company violated her civil rights during the final years of her employment. In particular, Plaintiff claims Defendant Kimberly-Clark, by and through its agents, unlawfully discriminated against her on the bases of her race[1] and sex,[2] and unlawfully retaliated against her when she complained of this discrimination.[3]  In response to Plaintiff's Complaint, Defendant filed a Motion for  Summary Judgment, which is now ripe for this Court's review. For the reasons set forth herein,  Defendant's Motion shall be granted.

---

[1]  Plaintiff mistakenly identifies her race as "Caucasian" in Paragraph 56 of her Amended Complaint.

[2] Although Plaintiff alleged discrimination on the basis of age in her EEOC Complaint, in the instant case, she does not invoke a right of action under the Age Discrimination in Employment Act of 1967 (AEDA) in her Amended Complaint. *See* Pl.'s App. Ex. 29; Am. Compl. 7-8 (pleading Count One of two under Title VII and Count Two of two under 42 U.S.C. § 1981).

[3] *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.* (as amended by the Civil Rights Act of 1991 at 42 U.S.C. §1981a); 42 U.S.C. §1981.

## II.      Factual Background

The undisputed facts[4] establish that Plaintiff was employed by Defendant in the Pulp Department at its Chester, Pennsylvania facility from May 1967 until March 20, 2012. (SUF ¶ 1; RSUF ¶ 1.) The Chester facility produces paper products, including toilet paper and paper towels. (SUF ¶ 2; RSUF ¶ 2.) Plaintiff was a member of the United Steelworkers Local Union 10-488, served as Shop Steward for many years, was Divisional Vice President in 2001, and was the only African American female Chief Shop Steward from 2009 until the end of her employment. (RSUF ¶ 3; RCMF ¶ 3.) As a union member, Plaintiff's employment was subject to the collective bargaining agreement ("CBA") in effect between Defendant and the union. (SUF ¶ 4; RSUF ¶ 4.) Plaintiff was familiar with the CBA. (SUF ¶¶ 5-6; RSUF ¶¶ 5-6.; Pl.'s Dep. 50:2-51:9.)

In January 2010, Defendant commenced an investigation regarding allegations of angry and otherwise inappropriate behavior by one of Plaintiff's coworkers, Joel Horne ("Horne"). (SUF ¶¶ 8-9; RSUF ¶¶ 8-9.) Plaintiff witnessed some of the events that prompted Defendant's investigation of Horne. (SUF ¶ 10; RSUF ¶ 10.) At the conclusion of its investigation, Defendant decided to terminate Horne's employment. (SUF ¶ 11; RSUF ¶ 11.) Since Horne was also a union member, he was entitled, under the CBA, to a grievance and arbitration process prior to his termination. (SUF ¶ 12; RSUF ¶ 12.) Plaintiff initially recommended that Horne be terminated but subsequently attended Horne's "second step" grievance meeting as his union representative. (CMF ¶ 9-10; RCMF ¶ 9-10.) Defendant remained steadfast in its decision to terminate Horne. (SUF ¶ 14; RSUF ¶ 14.)

On November 4, 2010, Plaintiff received a subpoena directing her to appear at Horne's arbitration hearing on November 9, 2010. (SUF ¶ 15; RSUF ¶ 15; Pl.'s App. Ex. 12.) The subpoena

---

[4] For purposes of this discussion, this Court shall refer to Defendant's Statement of Undisputed Facts as "SUF," Plaintiff's Response thereto as "RSUF," Plaintiff's Counterstatement of Material Facts as "CMF" and Defendant's Response thereto as "RCMF."

was delivered by Ron Schultz ("Schultz"), a level 6 employee of Defendant. (CMF ¶ 13; RCMF ¶ 13; Pl.'s Dep. 415:8-10, 416:3; Flynn Dep. 33:3-5.) Other employees at the Chester facility received similar subpoenas to attend the Horne arbitration hearing. (SUF ¶ 16; RSUF ¶ 16.) The CBA permits employees who are subpoenaed to take leave from work to fulfill witness duty and Plaintiff was familiar with this policy. (SUF ¶ 20; RSUF ¶ 20; Pl.'s Dep. 50:2-51:9; Langdon Decl. ¶ 15.) Although Plaintiff was unaware of anyone else failing to attend an arbitration when issued a subpoena, she elected to not attend the Horne arbitration hearing and instead, report to work. (SUF ¶¶ 17, 20, 24; RSUF ¶¶ 17, 20, 24.) Plaintiff maintains she did not attend because she believed the subpoena to be "fake"; however, she did not ask management or the union about the validity of the subpoena. (SUF ¶ 18; RSUF ¶ 18.) The other employees who received subpoenas did appear at the arbitration hearing. (SUF ¶ 19; RSUF ¶ 19.) John Flynn ("Flynn"), the Chester facility labor relations manager at the time, spoke with Plaintiff by phone about her presence at the arbitration hearing. (SUF ¶ 21; RSUF ¶ 21.) Flynn advised plaintiff that she had, in fact, been subpoenaed. (CMF ¶ 17; RCMF ¶ 17.) Despite Flynn's representations, Plaintiff still did not attend the arbitration hearing and as a result, on November 30, 2010, received a five-day suspension for insubordination. (SUF ¶¶ 22-23; RSUF ¶¶ 22-23; Pl.'s App. Ex. 28.)

Between November 30, 2010 and December 9, 2010, Plaintiff filed three grievances with Defendant's Human Resources Department relating to the circumstances leading up to her five-day suspension. (SUF ¶ 25; RSUF ¶ 25; Pl.'s App. Exs. 17-19.) In Grievance No. 46-10, she alleged "ongoing conspiracy to discriminate, intimidate, harassment by milice [sic], willful misconduct, fraud, and other wrong doings" but did not specify the basis for the alleged discrimination or harassment. (SUF ¶ 26; RSUF ¶ 26; Pl.'s App. Ex. 18.) Debra Tierno ("Tierno"), manager of the Human Resources Department at the Chester Facility, was assigned to investigate Grievance No. 46-10. (SUF ¶ 27;

RSUF ¶ 27.) Plaintiff and Tierno had difficulty meeting to discuss the contents of the grievance. (SUF ¶ 28; RSUF ¶ 28; Pl.'s App. Ex. 8.) On February 1, 2011, Plaintiff called the Kimberly-Clark Ethics and Compliance Employee Hotline and reported the allegations included in Grievance 46-10, as well as new allegations, such as age discrimination. (SUF ¶¶ 29-30; RSUF ¶¶ 29-30; Pl.'s App. Ex. 24.) During that call, Plaintiff asserted that Flynn wanted her to commit perjury at Horne's arbitration hearing by testifying that she supported Horne's termination when in fact, she did not support his termination. (SUF ¶ 31; RSUF ¶ 31.) Plaintiff also reported she did not think Tierno could be fair and impartial in investigating Plaintiff's grievance because she believed, although erroneously, that Tierno had signed her five-day suspension papers. (SUF ¶ 32, 32 n. 7; RSUF ¶ 32; Pl.'s App. Ex. 40.) Subsequently, Kimberly-Clark assigned Lori Ney ("Ney"), a human resources employee at corporate headquarters, to take over Tierno's investigation. (SUF ¶¶ 33-34; RSUF ¶¶ 33-34.) Ney interviewed Plaintiff and received extensive documentation from Plaintiff relating to her claims. (SUF ¶ 35; RSUF ¶ 35.) By April 27, 2011, Ney completed her investigation and concluded there was no evidence to support Plaintiff's allegations that she was asked to commit perjury or that she was a victim of discrimination. (SUF ¶¶ 36-37; RSUF ¶¶ 36-37.) Furthermore, Ney found multiple discrepancies between evidence she discovered and facts alleged by Plaintiff. (SUF ¶ 37; RSUF ¶ 37.) For example, Ney found that the subpoena showed enough detail that Plaintiff could have determined its validity, thereby undermining Plaintiff's claim that she did not appear at Horne's arbitration hearing because she believed the subpoena to be "fake." (SUF ¶¶ 38-39; RSUF ¶¶ 38-39.)  Ney also determined that Plaintiff provided various other reasons for not attending the arbitration, including her belief that Flynn wanted her to commit perjury by stating that she supported Horne's termination. (SUF ¶ 41; RSUF ¶ 41.) However, Plaintiff admitted to Ney that Flynn never directed her to commit perjury. (SUF ¶ 42; RSUF ¶ 42.) Based on the discrepancies between Ney's findings and Plaintiff's reports, Ney concluded

4

that Plaintiff had provided false information during the investigation, thereby directly and willfully violating Defendant's Code of Conduct.[5] (SUF ¶ 44; RSUF ¶ 44; Pl.'s App. Ex. 27.)  Although Ney's findings constituted grounds for termination, she did not participate in the decision-making process regarding any potential discipline for Plaintiff. (SUF ¶ 44; RSUF ¶ 44.)

As a result of Plaintiff's alleged Code of Conduct violation, on May 25, 2011, Defendant issued Plaintiff a fifteen-day suspension, a demotion of one pay level, and a Last Chance Agreement, which had been negotiated between Defendant and the union. (SUF ¶¶ 45-46; RSUF ¶¶ 45-46, Pl.'s App. Ex. 28.) According to the terms of the Last Chance Agreement, Plaintiff could be terminated for any future violations of the Code of Conduct, mill rules, or the CBA. (SUF ¶ 47; RSUF ¶ 47.) Although Plaintiff was informed that she would be terminated if she did not sign the Last Chance Agreement, she refused to do so and was not terminated. (SUF ¶¶ 48-49; RSUF ¶¶ 48-49.) After her suspension, Plaintiff resumed work and collected pay. (SUF ¶ 49; RSUF ¶ 49.)

On May 26, 2011, Plaintiff filed another charge of discrimination with the Equal Employment Opportunity Commission, alleging gender discrimination, age discrimination and retaliation. (SUF ¶ 50; RSUF ¶ 50; Pl.'s App. Ex. 29.) Plaintiff was absent from work on short-term disability leave from July 18, 2011 through October 17, 2011. (SUF ¶ 51; RSUF ¶ 51.) On November 9, 2011, Plaintiff again called the Code of Conduct Hotline claiming that Defendant's prior disciplinary action towards her was discriminatory and retaliatory, and that Plaintiff had received a voicemail from union vice president Sean Kane ("Kane"), at the end of which Kane could be heard making a statement containing foul language and referring to "her" being on a "list." (SUF ¶ 52; RSUF ¶ 52.) Defendant assigned Chelsea Hinkle ("Hinkle"), a Human Resources representative from corporate headquarters to investigate Plaintiff's November 9, 2011 Code of Conduct Hotline complaint. (SUF ¶ 53; RSUF ¶ 53.)

---

[5] Plaintiff was aware of the Kimberly-Clark Code of Conduct. (SUF ¶¶ 5-6; RSUF ¶¶ 5-6.)

In addition to interviewing Plaintiff, Ney, Tierno, Langdon, Kane, and union representative Bob Amis ("Amis"), Hinkle reviewed Plaintiff's February 1, 2011 Code of Conduct Hotline complaint and the associated investigation. (SUF ¶¶ 54-55; RSUF ¶¶ 54-55.) On February 2, 2012, Hinkle informed Plaintiff that the investigation did not reveal evidence that Plaintiff received the fifteen-day suspension, demotion or Last Chance Agreement because of her age or race. (SUF ¶¶ 56-57; RSUF ¶¶ 56-57.) Hinkle affirmed Ney's handling of Plaintiff's Grievance No. 46-10 and of Plaintiff's first (February 1, 2011) Code of Conduct Hotline complaint, and indicated that the inappropriate language of Kane's voicemail would be addressed with Kane. (SUF ¶¶ 58-59; RSUF ¶¶ 58-59.) Hinkle informed Plaintiff that she was disciplined for violating Defendant's Code of Conduct by providing untruthful and conflicting information during an investigation and not for contacting the Code of Conduct Hotline, which, Hinkle reiterated, Plaintiff was free to do. (SUF ¶¶ 60-62; RSUF ¶¶ 60-62.)

On January 2, 2012, Plaintiff sent a mass email to other employees, asking if anyone had knowledge of the "list" mentioned by Kane at the end of his voicemail to Plaintiff. (SUF ¶ 63; RSUF ¶ 63; Pl.'s App. Ex. 33.) Although she had no affirmative knowledge of a "list," Plaintiff stated that Horne had been on said list prior to his termination. (SUF ¶¶ 63-64; RSUF ¶¶ 63-64.) Plaintiff's email prompted multiple reports of complaints about her inappropriate use of email. (SUF ¶ 63; RSUF ¶ 63; App. Pl.'s Ex. 33.) Plaintiff also submitted the following communications:

- On January 20, 2012, Plaintiff filed a report through "ECAPS"—Defendant's electronic safety incident reporting system—alleging unsafe work conditions due to conspiracy and discrimination (SUF ¶ 65; RSUF ¶ 65; Pl.'s App. Ex. 34);

- On February 8, 2012, Plaintiff sent another group email to union members, pulp department employees, Langdon, and Tierno, in which she recounted information about the Horne termination and the adverse employment actions taken against her (SUF ¶ 66; RSUF ¶ 66; Pl.'s App. Ex. 35);

- On March 5, 2012, Plaintiff filed a second report via ECAPS, alleging retaliation, conspiracy and fraud, and requesting that Defendant honor the ultimatum associated with the Last Chance Agreement (SUF ¶ 67; RSUF ¶ 67; Pl.'s App. Ex. 36); and,

- On March 12, 2012, Plaintiff sent an email to Langdon and Tierno, insisting that they stop "[their] games and lies" or Plaintiff would "send [her] email to the hole [sic] plant…" (SUF ¶ 68; RSUF ¶ 68; Pl.'s App. Ex. 37).

Throughout the course of these events, Plaintiff otherwise maintained that Defendant honor the ultimatum associated with the Last Chance Agreement by terminating her. (SUF ¶ 69; RSUF ¶ 69.) Finally, on March 20, 2012, Plaintiff received a dismissal notice which stated that she was being terminated for violations of her Last Chance Agreement. (SUF ¶ 70; RSUF ¶ 70; Pl.'s App. Ex. 3.) From March 20, 2012 until the time of filing the instant action, Plaintiff did not hold any other employment. (SUF ¶ 71; RSUF ¶ 71.)

## III.    Summary Judgment Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support

7

the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001) (quoting *Celotex*, 477 at 325). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). Accordingly, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV.    Discussion

As a preliminary matter, this Court remains cognizant of the fact that a party opposing summary judgment may not rely on unsubstantiated allegations set forth in a Complaint or arguments presented in an Opposition Brief to withstand summary judgment.  Instead, "[i]f factual support for [a] claim exist[s] in the record, it [is] incumbent upon [the party opposing summary judgment] to direct the District Court's attention to those facts."  *DeShields v. Int'l Resort Props.*, 463 F. App'x 117, 120 (3d Cir. 2012). To the extent Plaintiff herein has failed to do so on numerous occasions, her unsupported allegations and unfounded arguments shall be deemed insufficient grounds for denial of summary judgment.

### A.    Gender & Race Discrimination under Title VII and 42 U.S.C. § 1981

Plaintiff alleges in her Amended Complaint that the foregoing facts show she was subjected to unlawful discrimination based on her sex (female) and race (African American), in violation of Title VII. (Am. Compl. ¶¶ 47-48,[6] 52; Pl.'s Mem. Opp'n 1-2.) She further alleges she was subject to unlawful discrimination based on her race in violation of 42 U.S.C. § 1981. (Am. Compl. ¶¶ 56-57, 59; Pl.'s Mem. Opp'n 1-2.)

---

[6]   Count I of Plaintiff's Amended Complaint is titled "Title VII of the Civil Rights Act of 1964 (Sex Discrimination and Retaliation)."  (Am. Compl. 7.)  Although Plaintiff does not include race in this title, she does allege discrimination on the basis of race in Paragraphs 47 and 52 of Count I.

8

###### i.    Procedural Considerations

Before turning to the merits of Plaintiff's Title VII claim, this Court must ensure Plaintiff has satisfied the administrative exhaustion requirement for bringing such a claim.  *See Robinson v. Dalton*, 107 F.3d 1018, 1022 (3d Cir. 1997) ("It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief.")  Regarding employment discrimination claims, a plaintiff must file a Charge of Discrimination form[7] with the EEOC and wait for the EEOC to investigate the claim and issue a right-to-sue letter before filing a lawsuit.  *See Burgh v. Borough Council of Montrose*, 251 F.3d 465, 470 (3d Cir.2001) (articulating the administrative process for discrimination claims).  Defendant argues that, inasmuch as Plaintiff did not assert a claim of race discrimination under Title VII in her EEOC Charge of Discrimination, she is foreclosed from making any such claim here because of her failure to exhaust administrative remedies. (Def.'s Mem. Supp. 17, n.14; Am. Compl. ¶¶ 8-9.)

Plaintiff filed two EEOC Charges of Discrimination.  Her first charge, dated April 13, 2009 alleged discrimination based on race and sex, and a right-to-sue letter was never issued. (Pl.'s App. Ex. 20.)  As a rule, complainants may not bring suit without obtaining a right-to-sue letter from the EEOC. *See Johnson v. City of Phila.,* Civ. No. 16-3651, 2016 U.S. Dist. LEXIS 170229, at *4 (E.D. Pa. Dec. 7, 2016) (holding that a Title VII claim must be dismissed "for failure to exhaust administrative remedies if the plaintiff does not submit a complaint to the EEOC or relevant state agency and obtain a right-to-sue letter, because both actions are prerequisites to filing suit under Title VII.") (citing *Robinson v. Dalton*, 107 F.3d 1018, 1022 (3d Cir. 1997)); *Price v. Schwan's Home Servs., Inc.*, Civ. No. 05-220, 2006 U.S. Dist. LEXIS 101434, at *12 (W.D. Pa. Apr. 3, 2006) ("Plaintiff's failure to obtain a right-to-sue letter for his Title VII claim is fatal to that claim.") (citations omitted).

---

[7]   Said Form is also referred to as "EEOC Form 5."

Technically, receipt of the right-to-sue letter is a statutory prerequisite to filing suit under Title VII. However, when faced with situations … where the relevant federal agency has failed to issue the letter even though the 180-day deadline has expired, other courts have allowed a plaintiff to maintain a Title VII action provided that she can show that she is entitled to the right-to-sue letter and has requested it. *See, e.g., Fouche v. Jekyll Island-State Park Authority*, 713 F.2d 1518 (11th Cir. 1983); *Johnson v. Duval County Teachers Credit Union*, 507 F. Supp. 307 (D. Fla. 1980); *Stapper v. Texas Dept. of Human Resources*, 470 F. Supp. 242 (D. Tex. 1979). *Cf. Moore v. City of Charlotte*, 754 F.2d 1100 (4th Cir.), *cert. denied*, 472 U.S. 1021, 87 L. Ed. 2d 623, 105 S. Ct. 3489 (1985) (plaintiff could sue without receipt of proper right-to-sue letter where plaintiff was entitled to the letter pursuant to the statute). The only alternative response would be to refuse to allow a plaintiff to proceed until receiving the letter, which would force the plaintiff to file an additional suit for a writ of mandamus compelling the relevant federal agency to issue the letter. This approach would, of course, be unduly cumbersome. Hence, courts allow a plaintiff to file suit under Title VII even without the right-to-sue letter provided she can show that she is entitled to and has requested the letter.

*Dougherty v. Township of Lower Merion*, Civ. No. 96-1589, 1996 U.S. Dist. LEXIS 6679, at *6-7 (E.D. Pa. May 21, 1996).

Plaintiff herein has provided no evidence of record to demonstrate she was entitled to a right-to-sue letter based on her April 13, 2009 EEOC Charge of Discrimination or that she requested such a letter after the 180-day investigation period expired. Therefore, Plaintiff's Title VII race discrimination claim is not administratively exhausted by her first EEOC Charge.

Plaintiff's second EEOC charge, dated May 26, 2011, alleged only sex and age discrimination but referred, in the statement of the particulars, to her prior charge based on race. (Pl.'s App. Ex. 29.) The EEOC issued a right-to-sue letter regarding this latter complaint on January 31, 2012, thereby notifying Plaintiff that she had ninety (90) days to commence suit in Federal Court. Plaintiff timely filed suit.

### a.    Count I

Count I of Plaintiff's Amended Complaint asserts a claim of both gender and race discrimination under Title VII. In contrast, Plaintiff's May 26, 2011 EEOC Charge of Discrimination, the basis of her right-to-sue, included allegations of gender discrimination but excluded allegations of race

discrimination.  (Pl.'s App. Ex. 29.)  Therefore, technically, Defendant is correct that this Court is

justified in dismissing Plaintiff's Title VII race discrimination claim for failure to exhaust required

administrative remedies.  This is so for several reasons.  First, Plaintiff appears to have deliberately

omitted allegations of race discrimination in her relevant EEOC Charge.  Although she specifically

alleged discrimination on the basis of race in her April 13, 2009 EEOC Charge, she did not check off the

race, color, or national origin box on her May 26, 2011 Charge when given the opportunity to do so.

(Pl.'s App. Ex. 29.)  In fact, in completing the statement of "particulars" in her 2011 Charge, Plaintiff

specifically referenced the fact that she had filed a previous EEOC Charge on October 31, 2008[8] on the

basis of race.  She then went on to claim only that male employees and younger employees received

preferential treatment and that she was retaliated against on the bases of her sex and age.  (Pl.'s App. Ex.

29.)

It is well-settled that:

> After a charge is filed, the scope of a resulting private civil action in the district court is
> defined by the scope of the EEOC investigation which can reasonably be expected to
> grow out of the charge of discrimination[.] Although this standard does not necessarily
> preclude a plaintiff from asserting a claim for the mere failure to check a box on an
> EEOC Charge Form, it does prevent a plaintiff from greatly expand[ing] an investigation
> simply by alleging new and different facts … following [her] charge. Because the EEOC
> is required to serve notice on the employer against whom the charges are made, this
> standard also allows an employer to be put on notice of the claims likely to be filed
> against it.

*Barzanty v. Verizon Pa., Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010) (internal quotation marks and

citations omitted).

Also, although box-checking is not *per se* dispositive, Plaintiff did not check the "Continuing

Action" box on her EEOC Charge form, thereby failing to notify the EEOC or Defendant that claims

outside the scope of those articulated in the 2011 Charge may arise based on subsequent activity.  *See*

---

[8]   Plaintiff mistakenly references a filing date of October 31, 2008 when in fact, the "Charge No." she
cites is that of the April 13, 2009 EEOC Charge of Discrimination.  (Pl.'s App. Exs. 20, 29.)

*Barzanty*, 361 F. App'x at 414 (affirming rejection of new discrimination claim in Federal Court where a plaintiff "provided no facts [in her EEOC Charge of Discrimination] that suggest [the newly-alleged discrimination], and she did not check the box indicating her charge was a 'continuing action.'"). "Only claims that are fairly within the scope of the prior administrative complaint, or the investigation arising therefrom can be considered to have been exhausted." *Thomas v. St. Mary Med. Ctr.*, 22 F. Supp. 3d 459, 468 (E.D. Pa. 2014) (internal quotations omitted).

However, this Court finds it is conceivable that, when viewed generously, Plaintiff's race discrimination claim could reasonably be expected to grow out of her 2011 EEOC Charge of gender discrimination. "[T]he kinds of claims that are considered exhausted though not specifically mentioned in the prior [EEOC] charge either arise during the pendency of the EEOC investigation, or are closely related to conduct alleged in the charge … or are considered explanations of the original charge." *Cross v. Donahoe*, Civ. No. 12-2670, 2014 U.S. Dist. LEXIS 189406, *9 (D.N.J. May 30, 2014) (internal quotations omitted). Because Plaintiff's Title VII race discrimination claim is based on the same facts as the Title VII gender discrimination charge asserted in Plaintiff's 2011 EEOC Charge, and because the legal analysis is the same for claims of race and gender discrimination under Title VII, this Court will consider Plaintiff's claim of race discrimination under Title VII.

### b.   Count II

Count II of Plaintiff's Amended Complaint alleges race discrimination under 42 U.S.C. § 1981. Said section "only protects against race discrimination and does not require exhaustion of administrative remedies." *Ingram v. Vanguard Group, Inc*., Civ. No. 14-3674, 2015 U.S. Dist. LEXIS 93016, at *28 n.11 (E.D. Pa. July 17, 2015) (citing *Johnson v. Ry. Exp. Agency, Inc*., 421 U.S. 454, 460 (1975) ("[T]he filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites to the institution of a Section 1981 action.")). Although Plaintiff did not allege race discrimination under

§ 1981 in her original Complaint, Federal Rule of Civil Procedure 15 permits "relation back" of an amendment "to the date of the original pleading" if said amendment "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading[.]"  Fed.R.Civ.P. 15(c)(1)(B).  Because Plaintiff's Section 1981 claim arises out of the same conduct alleged in her original Complaint, it "relates back" to the first Complaint and Defendant is not prejudiced by any lack of notice.

### ii. Claims Analysis Framework

Title VII makes it unlawful for an employer to discriminate against any individual with respect to compensation or terms, conditions, or privileges of employment on the basis of race or gender. 42 U.S.C. § 2000e–2(a).  Section 1981 requires both private and state entities to grant "[a]ll persons" the same rights as are "enjoyed by white citizens." 42 U.S.C. § 1981(a), (c). Race and gender-based discrimination claims brought under Title VII and race-based claims brought under § 1981 are all analyzed under the same burden-shifting scheme. *See Greer v. Mondelez Global, Inc.,* 590 F. App'x 170, 172 n.4 (3d Cir. 2014) ("Because the substantive elements of an employment discrimination claim brought under § 1981 are identical to those brought under Title VII, § 1981 claims are also governed by the *McDonnell Douglas* burden-shifting framework.") (citing *Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 267 (3d Cir. 2010)); *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 879-82 (3d Cir. 2011) (analyzing Title VII race and gender discrimination claims together); *Pamintuan v. Nanticoke Memorial Hospital*, 192 F.3d 378, 385 (3d Cir. 1999) ("We analyze section 1981 claims under the familiar *McDonnell Douglas* shifting burden framework used in Title VII discrimination cases."); Because Plaintiff's race and gender discrimination claims are based on the same conduct and analyzed under the same framework, this Court shall consider them together.

In *McDonnell Douglas Corp. v. Green*, the Supreme Court articulated "the standards governing the disposition of an action challenging employment discrimination."[9] 411 U.S. 792, 798 (1973). The Court refined these standards in *Texas Dep't of Cmty. Affairs v. Burdine*. 450 U.S. 248, 253 (1981). This Court incorporates those refined standards in the framework set forth below.

### a.    Step One - *Prima Facie* Case

"First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination." *Burdine*, 450 at 253.  To accomplish this,

> [d]iscrimination can be shown under either of two theories, disparate impact theory or disparate treatment theory. "A disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group and which cannot be justified as serving a legitimate business goal of the employer." *Equal Employment Opportunity Comm'n v. Metal Serv. Co.,* 892 F.2d 341, 346 (3d Cir.1990).  Under a disparate impact analysis, a plaintiff need not show intentional discrimination in order to prevail. *Id*. at 346-47.  In contrast to a disparate impact violation, a disparate treatment violation "is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly-situated on the basis of an impermissible criterion." *Id.* at 347. To proceed under a disparate treatment theory, plaintiff must prove that the employer had a discriminatory motive. *Id.*

*Crumpton v. Potter*, 305 F. Supp. 2d 465, 471–72 (E.D. Pa. 2004). In this case, Plaintiff's Amended Complaint alleges "disparate treatment." (Am. Compl. ¶¶ 1, 9.) Under a disparate treatment analysis, a plaintiff may establish a *prima facie* case of discrimination by presenting direct evidence of intentional discrimination by the defendant. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985). In the absence of direct evidence, a plaintiff can establish a *prima facie* case by showing the existence of circumstantial evidence which creates an inference of discrimination. *McDonnell Douglas,* 411 U.S. at 802.

---

[9] The issue before the *McDonnell Douglas* Court "concern[ed] the order and allocation of proof in a private, non-class action challenging employment discrimination." *McDonnell Douglas Corp. v. Green* 411 U.S. 792, 798 (1973).

14

Here, the record presents no direct evidence; only circumstantial. Therefore, Plaintiff must establish her *prima facie* case of discrimination by showing: "(1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (citing *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410–11 (3d Cir. 1999)). *See also Crumpton*, 305 F. Supp. 2d at 472 (same); *Harris v. SmithKline Beecham*, 27 F.Supp.2d 569, 578 (E.D.Pa.1998) (same).  For purposes of satisfying the fourth element, a plaintiff must demonstrate that similarly-situated persons outside the protected class were treated more favorably. *Crumpton*, 305 F. Supp. 2d at 472. *See also International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977) ("Proof of discriminatory motive . . . can in some situations be inferred from the mere fact of differences in treatment."). While "similarly-situated" does not necessarily mean identically situated, the plaintiff must nevertheless be similar in "all relevant respects." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009) (citing *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997)). This often requires a showing that the relevant aspects of the plaintiff's employment situation are "'nearly identical' to those of the co-workers that plaintiff alleges were treated more favorably." *Hobson v. St. Luke's Hosp. & Health Network*, 735 F. Supp. 2d 206, 214 (E.D. Pa. 2010) (citing *Solomon v. Philadelphia Newspapers, Inc.,* 2008 U.S. Dist. LEXIS 41978, at *42-43 (E.D. Pa. May 21, 2008) (Giles, J.)). Demonstrating that employees are similarly-situated often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik*, 335 F. App'x at 223. To that end, a plaintiff must show "'that the other employee's acts were of "comparable seriousness" to his own infraction.'" *Anderson v. Haverford College*, 868 F. Supp. 741, 745 (E.D.

Pa.1994) (quoting *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir. 1988)). *See also McDonnell Douglas*, 411 U.S. at 804 (considering whether comparators were "involved in acts . . . of comparable seriousness to" the plaintiff's acts). Whether a particular fact or circumstance is relevant for purposes of a "similarly-situated" analysis must be determined by the context of each case. *Hobson*, 735 F. Supp. 2d at 214 (citing *Houston v. Easton Area School District,* 355 F. App'x 651, 654 (3d Cir.2009)).

### b.        Step Two - Rebuttal

Second, if a plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's [treatment]." *Burdine*, 450 U.S. at 253.  To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993) (emphasis in original). "The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons." *Blackwell-Murray v. PNC Bank*, 963 F. Supp. 2d 448, 461 (E.D. Pa. 2013).

### c.        Step Three - Pretext

Third, if the defendant rebuts the plaintiff's *prima facie* case, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine* 450 U.S. at 252–53 (citing *McDonnell Douglas* 411 U.S. at 804).  Therefore, in order to survive summary judgment, "a plaintiff must submit evidence [of pretext] from which a factfinder could reasonably either (1) disbelieve

the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). In showing pretext, it is not enough to reassert the facts of the *prima facie* case. *Burdine*, 450 U.S. at 255 ("[T]he [pretext] factual inquiry proceeds to a new level of specificity."); *see also Martin v. Gen. Elec. Co.*, 891 F. Supp. 1052, 1056 (E.D. Pa. 1995) ("[A] plaintiff can defeat a motion for summary judgment either by discrediting defendant's reason or by coming forward with additional evidence of discrimination[.]"). Therefore, a plaintiff's *prima facie* case, combined with "evidence suggesting that an employer's proffered reasons for an adverse employment action are false . . . may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred." *Mitchell v. Miller,* 884 F.Supp.2d 334, 371 (W.D. Pa. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48 (2000)).

The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Burdine*, 450 U.S. 248 at 253. Utilizing these standards, this Court shall address the bases for each of Plaintiff's claims in turn.

### iii.   Claims Analysis

#### a.   Arbitration Subpoena

Plaintiff first alleges discrimination by Defendant in its handling of the Horne arbitration issue. (Am. Compl. ¶ 30-36, 46, 47, 55-59; Pl.'s Mem. Opp'n 11-12.)  In moving for summary judgment, Defendant argues that Plaintiff did not sustain her burden regarding the Horne arbitration-related discrimination claim because she failed to show any adverse action in the events leading up to said arbitration and because she failed to identify any legitimate comparators.  (Def.'s Mem. Supp. 10-11; Def.'s Reply 2.)  Defendant's conclusion is correct.

17

There is no dispute that as an African American woman, Plaintiff is a member of a protected class. Similarly, no question has been raised about whether Plaintiff was qualified for the position she held and the record does not indicate otherwise.  With respect to the third element, an adverse employment action is "'an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.,* 390 F.3d 760, 764 (3d Cir.2004)). The relevant adverse action in this instance is Plaintiff's five-day suspension. The record demonstrates that said suspension was non-paid. (Pl.'s Dep. 61: 7-9; Pl.'s App. Ex. 40.) Therefore, the five-day suspension altered Plaintiff's compensation and qualifies as an adverse employment action.

It is with the fourth element—an inference of discrimination—that Plaintiff has failed to satisfy her *prima facie* burden.  Plaintiff claims Defendant's discriminatory animus is apparent in the disparity shown by the fact that she received her subpoena from a lower-ranking employee than her coworkers. According to former Kimberly-Clark plant manager John Flynn,  Plaintiff's service from Schultz, a level 6 employee, was normal. (Flynn Dep. 31:12-32:10; s*ee also* Pl.'s App. Ex. 17.) Plaintiff further claims she was not relieved of work duties, but the subpoena itself reads: "We command you that, all business and excuses being laid aside, you … attend [the hearing]." (Pl.'s App. Ex. 12.) Notwithstanding the language of the subpoena, Plaintiff's claim of lack of relief is rendered immaterial by the fact that the CBA, with which Plaintiff was very familiar, relieves subpoenaed workers of job duties to fulfill witness duty. (Pl.'s Dep. 50:2-51:9; Langdon Decl. ¶ 15.) This claim is also belied by the fact that Plaintiff did not exert the minimal effort required by the company subpoena process, with which Plaintiff was also familiar,[10] to formally obtain a leave of absence. [11]

---

[10] Plaintiff was familiar enough with the subpoena process to teach others about it. (Pl.'s Dep. 292:18-24.)

Plaintiff further claims she doubted the validity of the subpoena because it was not completely filled out or sealed. Any question surrounding the validity of the subpoena was answered when Flynn contacted Plaintiff on the day of the arbitration and told her she had, in fact, been subpoenaed.[12]  Putting aside Plaintiff's lack of effort in determining the authenticity of the subpoena or attempting to comply with it, the fact that she was unwilling to comply *after having been explicitly advised of its validity* suggests her failure to attend was willful. The facts of record clearly demonstrate Plaintiff's refusal to attend the arbitration and do not permit an inference of discrimination.  Accordingly, Plaintiff has failed to meet her *prima facie* burden.

Assuming *arguendo* Plaintiff could establish a *prima facie* case of discrimination, willful failure to comply with legitimate orders constitutes insubordination[13]—the non-discriminatory reason proffered by Defendant for the five-day suspension. Defendant's proffered reason satisfies its burden of production under the second step of the *McDonnell Douglas* framework. Plaintiff's corresponding attempts to establish pretext fail.

Plaintiff first endeavors to show pretext by arguing that since the subpoena was signed by the arbitrator and not the company, she was not insubordinate to the company. (Pl.'s Mem. Opp'n 17.) Inasmuch as the subpoena is *designed* to be signed by the arbitrator, whose authority derives from the Collective Bargaining Agreement between the company and the union, this argument is without merit. (Pl.'s App. Ex. 12); *see also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974) (articulating the source of the arbitrator's authority). Plaintiff further attempts to argue Flynn never told her to go to the

---

[11] Workers may obtain formal permission to absent themselves by simply presenting the subpoena to their asset leader. (Langdon Dep. 62:6-19.)

[12] Plaintiff plainly conceded this point during her deposition, when she said: "I talked directly with John Flynn and John Flynn said that the arbitrator subpoenaed me…" (Pl.'s Dep. 78:16-18; *see also* Pl.'s App. Ex. 11 (email reflecting the same information).)

[13] *See* Merriam Webster, https://www.merriam-webster.com/dictionary/insubordinate (last visited Mar. 22, 2017) (defining "insubordinate" as "disobedient to authority.").

19

arbitration. (Pl.'s Mem. Opp'n 17.) However, the record clearly demonstrates Flynn told her she was

subpoenaed. (Pl.'s Dep. 78:16-18; Pl.'s App. Ex. 11.) Lastly, Plaintiff argues her failure to attend the

Horne arbitration was of no consequence because the company prevailed at the arbitration. This "no

harm no foul" argument is of no moment. A finding of insubordination does not depend on the result of

a failure to comply with legitimate orders; it is the failure itself that constitutes insubordination.  *See*

*Sampath v. Concurrent Techs. Corp.,* Civ. No. 03-264, 2008 U.S. Dist. LEXIS 25715, at *146 n.47

(W.D. Pa. Mar. 31, 2008) (defining "'insubordinate' [as] '[n]ot submissive to authority:

DISOBEDIENT[,]'" and concluding "Plaintiff cannot show pretext; he was clearly insubordinate.")

(citation omitted).

Accordingly, Plaintiff has not sustained her burden with regard to the Horne arbitration.

### b.      The "List"

Plaintiff's Amended Complaint also alleges discrimination by Defendant on the basis of the

voicemail message left on her answering machine by union Vice President Sean Kane, which Plaintiff

claims demonstrated "such animosity toward her as the only African American, woman Chief Shop

Steward."  (Am. Compl. ¶¶ 42-43.)

The purpose of Kane's phone call that day was to remind Plaintiff of the date of her grievance

meeting.  (Hinkle Decl. ¶ 7.)  After receiving no answer, Kane left Plaintiff his contact information on

her voicemail, so that she would return the call.  (Am. Compl. ¶ 42.)  Plaintiff acknowledges in her

pleadings that the language upon which she bases this discrimination claim was not speech intended for

her but instead, was part of a discussion Kane was having with another individual in the room, during

which Plaintiff's name was never mentioned.  (Am. Compl. ¶ 42.)

In assessing whether Plaintiff has satisfied her *prima facie* burden as it pertains to the "list" [14]

claim, she again meets the "protected class" and "qualified" prongs.   However, in this instance, she fails

to show any adverse employment action at all, let alone adverse action *by Defendant*.   Plaintiff points to

no evidence to show that Kane's voicemail was "serious and tangible enough to alter [her]

compensation, terms, conditions, or privileges of employment." *Jones*, 796 F.3d at 326.   Furthermore,

since Kane was an officer of the union and not of Defendant, his voicemail was not "an action by an

employer." *Id.*   Plaintiff has provided no evidence of record to demonstrate that Kane was involved in

Defendant's decision-making process regarding any of its disciplinary actions against Plaintiff. *See*

*Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) ("We have generally held that

comments by those individuals outside of the decisionmaking chain are stray remarks, which, standing

alone, are inadequate to support an inference of discrimination.").   In fact, Plaintiff alleges Kane's

voicemail impacted her view of the union, not Defendant. [15] Because the conduct Plaintiff cites is not

sufficiently adverse and is attributed to the union and not Defendant, she has failed to satisfy the third

element of her *prima facie* case. [16]   Absent same, Plaintiff cannot succeed on her claim of discrimination

---

[14]   Despite Plaintiff's attempt to verify the existence of the "list" via mass email, she has provided no evidence of record to demonstrate its existence.

[15]   *See* Am. Compl. ¶ 43 ("After that voicemail, Plaintiff doubted that she could receive a fair and impartial arbitration of her grievances against Kimberly-Clark due to the fact that the entity designed to protect her, *the Local 10-488, held such animosity toward her* as the only African American, woman Chief Shop Steward.") (emphasis added).

[16]   This Court further notes that even if Plaintiff could satisfy the "adverse action" prong of her *prima facie* burden, she does not point to any comparators or otherwise demonstrate an inference of discrimination.

        Moreover, Plaintiff has not demonstrated pretext in response to Defendant's articulation of a non-discriminatory explanation. Defendant asserts Kane's message was neither directed toward Plaintiff, nor threatening toward her. (SUF ¶ 52 n.8, ¶ 58 n.10; Hinkle Decl. ¶¶ 7-8.) Defendant contends that after recording a message for Plaintiff, Kane inadvertently recorded himself addressing another person in the room about something not related to Plaintiff. (SUF ¶ 52 n.8, ¶ 58 n.10; Hinkle Decl. ¶¶ 7-8.) Specifically, Kane said that his wife was currently on his "shunned list," and he was joking with another employee that the other employee was going to end up on that list as well. (Hinkle Decl. ¶ 8.) Hinkle found no other evidence to support that some kind of "list" existed or that Plaintiff was on it. (Hinkle

involving Kane's voicemail and the "list," and Defendant is accordingly entitled to summary judgment on same.

c.     **Internet Violations**

Defendant next seeks summary judgment on Plaintiff's claim that Defendant engaged in unlawful discrimination by demoting her and cutting her pay for giving false information during an investigation, while failing to demote or cut the pay of white male employees who viewed internet pornography. (Am. Compl. ¶¶ 38, 40; Pl.'s Mem. Opp'n 12; SUF ¶ 76-77; RSUF ¶ 76-77.)

For the reasons discussed above, the first two elements of Plaintiff's *prima facie* case are satisfied and demotion with pay reduction qualifies as adverse action, thereby satisfying the third element.  However, Plaintiff again fails to establish an inference of discrimination regarding this claim.

Keeping in mind that the similarly-situated analysis often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them[,]" Plaintiff has failed to meet her burden. *Houston*, 355 F. App'x at 654 (quoting *Radue*, 219 F.3d at 617-18). Some of the white male employees in question reported to the same supervisor. (Pl.'s Dep. 105:9-109:11; 337:21-338:11.) However, these individuals clearly did not engage in similar behavior. Plaintiff concedes that a violation of internet policy is different from giving false information during an investigation but then proceeds to assert they are comparable in that both constitute Code of Conduct violations. (Pl.'s Mem. Opp'n 13.) The mere fact

_____

Decl. ¶ 9.) More importantly, Plaintiff points to no record of evidence to challenge Defendant's explanation. Instead, Plaintiff summarily claims Kane's voicemail was threatening and caused her to feel threatened. (Am. Compl. ¶ 43; Pl.'s Mem. Opp'n 13; RSUF ¶ 52.)  "To survive summary judgment, a party must present more than 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Thus, even if Plaintiff could establish a *prima facie* case of discrimination, her allegations regarding Kane's voicemail and the "list" would still fail at the pretext stage of the *McDonnell Douglas* framework.

22

that different behaviors violate the Code of Conduct does not make them comparable.[17] *See Opsatnik*, 335 F. App'x at 223 (finding different violations not "automatically comparable" just because they fall under company disciplinary framework). Plaintiff's contention that a jury could properly find the violations "comparable *in nature*" is misguided. (Pl.'s Mem. Opp'n 13 (emphasis added).) These violations plainly elicit different responses and require different remedial action by employers. *See Rene v. Lidestri Foods, Inc.,* Civ. No. 09-3908, 2010 U.S. Dist. LEXIS 122246, at *20 (D.N.J. Nov. 17, 2010) (distinguishing the negative conduct of two employees who exchanged verbal threats and racial slurs, and finding that the "differentiating circumstances place Plaintiff's conduct, and [his employer's] response, in a very different category . . . [thereby rendering the other employee] an unsuitable comparison."). Thus, Plaintiff's conduct and that of her white male coworkers is not "without such differentiating . . . circumstances as would distinguish . . . the employer's treatment of them." *Houston*, 355 F. App'x at 654 (quoting *Radue*, 219 F.3d at 617-18).

Accordingly, Defendant is entitled to summary judgment on this claim.

### d.    Replacement

Plaintiff further claims that Defendant's decision to fill her position with a Caucasian male (first temporarily and then permanently) after she was demoted evinces Defendant's discriminatory animus. (Am. Compl. ¶¶ 45, 47, Pl.'s Mem. Opp'n 13.) Defendant responds that Plaintiff's argument is insufficiently substantiated because Plaintiff cannot recall the name of the Caucasian male who replaced her. (Def.'s Reply 4-5.)

With regard to Defendant's response, it is the race and gender, not the name, of Plaintiff's replacement that is at issue.  Therefore, Plaintiff's inability to recall the name of the Caucasian male

---

[17] Human Resources business partner Lori Ney testified that all Code of Conduct violations are not comparable. (Ney Dep. 22: 9-11) ("Q: [A]re some violations of the code [of conduct] more serious than others? A: Yes.".)

who replaced her is not critical[18] and this Court will consider her claim.

Again, the first two elements of Plaintiff's *prima facie* case are satisfied.  Plaintiff's demotion, which created the opening for her replacement, was accompanied by a reduction in pay and therefore qualifies as an adverse action, satisfying the third element.  *Jones*, 796 F.3d at 326.  Plaintiff argues the interclass replacement itself automatically infers discrimination and therefore satisfies the fourth element of her *prima facie* case.  However, this is not necessarily so.

While replacement by someone outside the protected class may have some contextual evidentiary force, it does not automatically infer discrimination by the employer. *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 353 (3d Cir. 1999). The surrounding circumstances may permit an inference of discrimination regardless of intra-class replacement. *Pivirotto*, 191 F.3d at 353-54. Obversely, the mere fact a plaintiff is replaced by someone outside the protected class does not necessarily mean the employer acted with discriminatory intent. It is important to consider the replacement in light of the surrounding circumstances. *Hobson*, 735 F. Supp. 2d at 214 (recognizing "the inquiry is highly factually dependent"). Furthermore, it is important to bear in mind that:

> [t]he central focus of the inquiry in a case such as this is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin. The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (U.S. 1978) (internal quotation marks and citations omitted).

---

[18] Plaintiff's memory lapse may speak to the credibility of her claim but credibility assessment is not relevant at this stage.  *See St. Mary's,* 509 U.S. at 509 (finding that although a plaintiff's inability to remember such details may speak to the credibility of her claim, the court does not reach the credibility-assessment stage in considering the first two steps of the *McDonnell Douglas* framework).

Moreover,

> Title VII . . . was not intended to diminish traditional management prerogatives. It does not require the employer to restructure his employment practices to maximize the number of minorities and women hired … Title VII does not obligate an employer to [hire the minority or female applicant whenever that person's objective qualifications were equal to those of a white male applicant]. Rather, the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria.

*Burdine*, 450 U.S. at 259 (internal quotation marks and citations omitted). *See also Ruff v. Temple Univ.,* 122 F. Supp. 3d 212, 220 (E.D. Pa. 2015) (quoting the same text from *Burdine*).

Other than the fact that these two replacements occurred, Plaintiff puts forth no evidence that would permit an inference of discrimination.  Instead, she submits her own testimony, in which she claimed her temporary and permanent replacements were Caucasian, and that her permanent replacement had less seniority than Plaintiff.   (Pl.'s Mem. Opp'n 13.)  This is simply not enough.  The broad factual context in this case indicates Plaintiff's replacements were two of the last events to occur in the drawn-out deterioration of the decades-long relationship between Defendant and Plaintiff.  It was the result of situational momentum.  Defendant's actions throughout this protracted process do not infer discriminatory animus but instead, demonstrate magnanimity, judiciousness, and reluctance to terminate a loyal employee. Defendant gave Plaintiff two formal warnings, providing Plaintiff with not just a second chance, but a third chance as well. Defendant encouraged Plaintiff to contact company personnel support. Defendant engaged a local Human Resources specialist to investigate Plaintiff's initial complaints and when Plaintiff expressed dissatisfaction with the local Human Resources personnel, Defendant engaged multiple Human Resources specialists from headquarters to investigate her complaints. Defendant gave Plaintiff ample opportunity to express herself and ample opportunity to conform her behavior to the company Code of Conduct. Defendant allowed Plaintiff to continue to work for ten months after she refused to sign the Last Chance Agreement and receive compensation.

25

Inasmuch as Plaintiff has failed to point to any evidence of record to show unlawful

discrimination in the many events leading up to her demotion, she has failed to show there was

discriminatory animus at play when Defendant filled the vacancy left by her demotion and ultimate

termination.

In view of the foregoing, Defendant is entitled to summary judgment on Plaintiff's replacement

claim, together with all of Plaintiff's discrimination claims as alleged in her Amended Complaint.[19]

## B.    Retaliation Under Title VII

Title VII prohibits retaliation by making it unlawful for employers to discriminate against "any

individual . . . because he has opposed any . . . unlawful employment practice" or because that individual

has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing." 42 U.S.C. § 2000e-3(a). "[Title VII's] retaliation provision protects an individual not from all

retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v.

White*, 548 U.S. 53, 67 (2006). "Where there is no direct evidence of retaliation, claims alleging

retaliation under Title VII are analyzed under the [same] *McDonnell Douglas* burden-shifting

framework" used in discrimination analysis.[20] *Young v. City of Philadelphia Police Dep't*, 651 F. App'x

90, 95 (3d Cir. 2016) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)). [21]

Utilizing the *McDonnell Douglas* framework to establish retaliation, a plaintiff must proffer

---

[19] Defendant addresses additional arguments Plaintiff presented at her deposition and referenced in her
Opposition Brief.  (Def.'s Mem. Supp. 9-10.)  However, this Court shall not address claims that were
never pleaded in Plaintiff's Amended Complaint.  *See McMahon v. Salmond*, 573 F. App'x 128, 135 (3d
Cir. 2014) (affirming District Court's grant of summary judgment after said Court "concluded that
[Plaintiff] did not plead an appropriate retaliation cause of action and that it 'would not read his
opposition papers to do so' at summary judgment.") (citing *Bell v. City of Phila.*, 275 F. App'x 157, 160
(3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to
a motion for summary judgment.")).

[20] *See* sections IV.A.ii, *supra*.

[21]  *Young* and *Moore* both exemplify application of the *McDonnell Douglas* burden-shifting scheme to a
Title VII retaliation claim.

evidence to demonstrate: (1) s/he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him or her; and (3) there was a causal connection between the plaintiff's participation in the protected activity and the adverse employment action. *Young*, 651 F. App'x at 95 (citing *Moore*, 461 F.3d at 340-41). "To establish causation at the prima facie stage, a plaintiff must introduce evidence about the 'scope and nature of conduct and circumstances that could support the inference' of a causal connection." *Young*, 651 F. App'x at 95 (quoting *Farrell v. Planter's Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000)). To that end,

> [a] plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between his protected activity and the adverse action taken against him. *Farrell*, 206 F.3d at 284. In certain narrow circumstances, an "unusually suggestive" proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997).

*Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended* (Aug. 28, 2007).  *See also Williams v. Phila. Hous. Auth. Police Dep't.*, 380 F.3d 751, 759-60 (3d Cir. 2004).

Once a plaintiff has established a *prima facie* case of retaliation, the defendant must articulate a legitimate, non-retaliatory reason for its actions. *Young*, 651 F. App'x at 95 (citing *Moore*, 461 F.3d at 342). If the defendant satisfies this burden of production, the burden shifts back to the plaintiff "to convince the factfinder both that the employer's proffered reason was [pretext], and that retaliation was the real reason for the adverse employment action." *Young*, 651 F. App'x at 95 (citing *Moore*, 461 F.3d at 342). "To prove causation at the pretext stage, the plaintiff must show that she would not have suffered an adverse employment action 'but for' her protected activity." *Young*, 651 F. App'x at 96 (signaling *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)).  *See also Carvalho-Grevious v. Del. State Univ.*, 2017 U.S. App. LEXIS 4992, at *16-17 (3d Cir. 2017) (holding a showing of "but for" causation is not required prior to the pretext stage).

27

In this case, Plaintiff claims Defendant violated Title VII by retaliating against her in response to her complaints of discrimination and in violation of Title VII. (Am Compl. ¶¶ 46-54.) In moving for summary judgment, Defendant argues Plaintiff's Title VII retaliation claim must fail because her underlying discrimination claims were not reasonable and were not made in good faith.[22] (Def.'s Mem. Supp. 25.) The fact that Plaintiff has failed to establish even a single *prima facie* case of discrimination does cast doubt on the reasonableness of her claims. However, because a successful underlying Title VII discrimination claim is not a prerequisite for a Title VII retaliation claim, this Court will consider Plaintiff's Title VII retaliation arguments. *See Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 969 (3d Cir. 1978) ("Even if a charge filed with the EEOC is found to be without merit, the employee is protected in making that charge by [Title VII] …").

### i.    Direct Evidence and Kane's Commutation

Plaintiff first argues there is direct evidence of retaliation in her assertion that union vice-president Kane told her she would be suspended for three days if she did not grieve her insubordination discipline, or five days if she did. (Am. Compl. ¶ 35; Pl.'s Mem. Opp'n 25.)  First, Plaintiff points to no evidence of record to substantiate this argument.  *See Thomas v. Shaw,* 632 F. App'x 716, 720 (3d Cir. 2015) (affirming summary judgment where "Plaintiff relie[d] solely on his own testimony and speculation to support his claims.").  Second, Kane is an officer of the union and not of Defendant, Kimberly-Clark. Plaintiff points to no evidence of record to show Kane represented Defendant in this context or that this was Defendant's policy. Therefore, Defendant is entitled to summary judgment with respect to this argument.

---

[22] In support of same, Defendant relies upon *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 n.9 (3d Cir. 2007) (holding anti-retaliation provisions apply only when plaintiff "shows that a 'reasonable person in [his] circumstances would have concluded that the employer was engaging in discriminatory conduct'") and *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) ("[A]n action is not protected activity under Title VII unless the employee has a 'good faith' belief that the objected-to practice is discriminatory.").

ii.    *Prima Facie* **Case by Circumstantial Evidence**

a.    **Protected Activities and Adverse Actions**

Plaintiff also endeavors to show retaliation using circumstantial evidence. In attempting to establish the first element of a Title VII *prima facie* case of retaliation, Plaintiff contends she engaged in the following "protected activities": (1) filing an EEOC charge of discrimination on April 13, 2009; (2) pursuing an internal grievance alleging discrimination on November 30, 2010; (3) submitting a company hotline complaint on February 1, 2011; (4) filing a second EEOC discrimination charge on May 26, 2011; (5) submitting a second company hotline complaint on November 9, 2011; and (6) sending mass emails complaining of discrimination and retaliation on January 6, 2011 and January 2, 2012. (Am. Compl. ¶¶ 8, 36; Pl.'s Mem. Opp'n 21-22.)

In attempting to establish the second *prima facie* case element, Plaintiff asserts the following adverse actions: (1) unpaid suspensions, the first of which was issued on November 30, 2010 and the second of which was issued on May 25, 2011; (2) demotion, issued on May 25, 2011; (3) pay reduction, issued on May 25, 2011; (4) Last Chance Agreement, issued on May 25, 2011, and, (5) termination, issued on March 20, 2012. (Am. Compl. ¶¶ 38, 44, 52; Pl.'s Mem. Opp'n 24.) Because these actions do not independently bear on the question of retaliation, this Court shall consider Plaintiff's alleged protected activities and adverse actions in the context of her attempts to show the causal link required by the third and final element of a *prima facie* case of retaliation.

b.    **Causal Link**

1.    **November 30, 2010 Five-Day Suspension**

Plaintiff first claims there is temporal proximity, suggestive of a causal link, between her April 13, 2009 EEOC Charge of Discrimination and her October 29, 2010 subpoena and the associated November 30, 2010 five-day suspension. (Pl.'s Mem. Opp'n 25-26; *see also* Pl.'s App. Exs. 12, 20, 40.)

Because filing an EEOC Charge of Discrimination is undisputedly a protected activity, Plaintiff

establishes the first element. With respect to the second element, an adverse action in the context of a

retaliation claim must be "materially adverse" such that it "might have dissuaded a reasonable worker"

from engaging in protected activity.[23] *Burlington*, 548 U.S. at 68. In light of this standard, issuance of a

subpoena is not an adverse action. A non-paid five-day suspension, on the other hand, does qualify as

materially adverse, thus Plaintiff establishes one adverse action to satisfy the second element of a *prima*

*facie* case of retaliation.  However, she does not establish the third element. The span of time between

the protected activity (EEOC Charge of Discrimination) and the claimed corresponding adverse action

(five-day suspension) is approximately one and one-half years – not particularly suggestive of a causal

link. As Defendant correctly points out, "[d]ays are suggestive, months are not."[24] *Rosati v. Colello*, 94

F. Supp. 3d 704, 717 (E.D. Pa. 2015), *appeal dismissed* (Dec. 10, 2015) (citing *Williams v. Philadelphia*

*Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir.2004)). Temporal proximity on the order of years is

certainly not *per se* suggestive of a retaliatory causal link. To hold otherwise would undermine the

---

[23] This criteria is meant to sift out "trivial harms," leaving only "significant" ones. *Burlington*, 548 U.S. at 68.

[24] This does not mean it is impossible to establish a causal connection between protected activities and adverse actions that are temporally remote. It simply means that substantial temporal separations are not particularly suggestive of a causal link in the same way as diminutive temporal separations. Plaintiff construes a quote from *Kachmar v. SunGard Data Systems, Inc.* ("the absence of immediacy between the cause and effect does not disprove causation" 109 F.3d 173, 178 (3rd Cir. 1997)) to mean "no specific time parameters are required to establish temporal proximity and raise an inference of causation." (Pl.'s Mem. Opp'n 24.) In *Kachmar*, the Third Circuit specified that the third element of a plaintiff's *prima facie* case is causation, not simply temporal proximity. *Kachmar*, 109 F.3d at 178. In doing so, emphasis was placed on the fact that the causation inquiry is "highly context-specific," and therefore the temporal proximity test should not be applied rigidly or mechanically according to specific criteria but rather with perspective or relevant context. *Id.*  Although said court considered it conceivable that longer time spans could, in context, infer causation, such an inference would be drawn in spite of the temporal proximity test and would be based on the surrounding circumstances, not the temporal relationship. The *temporal proximity* test clearly treats shorter temporal separations as more probative of causation than longer ones. For the reasons set forth herein, this Court finds the context in this case does not support exceptional treatment of the temporally remote protected activities and adverse actions put forth by Plaintiff.

safeguards afforded an employer under Title VII by requiring a plaintiff to prove the third element of a *prima facie* case of retaliation.

### 2. May 25, 2011 Fifteen-Day Suspension and Demotion

Plaintiff next argues that her November and December 2010 internal complaints regarding her first suspension, her January 2011 group email complaint, and her February 2011 company hotline complaint are all temporally close enough to her May 25, 2011 suspension, demotion and Last Chance Agreement, to infer a causal link. (Pl.'s Mem. Opp'n 25; *see also* Pl.'s App. Exs. 7, 17-19, 24, 28.) This Court acknowledges that "in the context of a retaliation claim, protected activity extends beyond formal complaints … and can include informal protests" such as Plaintiff's internal and email complaints. *Mikell v. Marriott Int'l, Inc.*, 789 F. Supp. 2d 607, 611 (E.D. Pa. 2011). Furthermore, Plaintiff's demotion and fifteen-day suspension "might … dissuade[] a reasonable worker" from engaging in protected activity and therefore constitute adverse actions. *Burlington*, 548 U.S. at 68.  However, Plaintiff's internal complaints occurred approximately five months prior to the claimed suspension and demotion, the email complaint occurred approximately four months prior, and the hotline complaint approximately three months prior. Viewed in the full context of everything that occurred, Plaintiff's claim of temporal proximity is refuted by the relative remoteness of these events. *See Kachmar*, 109 F.3d at 178 (emphasizing the importance of context in retaliation causation inquiries); *Rosati* , 94 F. Supp. 3d at 717 (finding months not particularly suggestive).

Accordingly, Plaintiff has failed to establish a *prima facie* case of retaliation with respect to the May 25, 2011 fifteen-day suspension and demotion.

### 3. Kane's Voicemail

Plaintiff further argues the existence of suggestive temporal proximity in the three-month interval between her May 26, 2011 EEOC Charge of Discrimination and the voicemail she received

from Kane that referenced a "list." (Am. Compl. ¶ 42; Pl.'s Mem. Opp'n 25; Pl.'s App. Ex. 29.)

For the reasons set forth above in this Court's assessment of Plaintiff's voicemail-based discrimination claim, Kane's telephonic communication does not constitute an adverse action and therefore fails to satisfy the third prong of the retaliation *prima facie* case analysis. Even assuming Kane's voicemail could constitute an adverse action, three months' separation, without more, is not particularly suggestive of a causal link in the context of this case.[25] *See Kachmar*, 109 F.3d at 178 (emphasizing the importance of context in retaliation causation inquiries);  *Rosati*, 94 F. Supp. 3d 717 (finding months not particularly suggestive).[26]

Accordingly, Plaintiff has failed to sustain her *prima facie* burden with respect to Kane's voicemail message.

### 4.        March 20, 2012 Termination

In the final temporal proximity argument presented by Plaintiff, she contends her January 2, 2012 mass email complaint, January 20, 2012 ECAPS complaint, February 8, 2012 group email complaint, March 5, 2012 ECAPS complaint, and March 12, 2012 email threat were all sufficiently close to her March 20, 2012 termination to suggest a causal link. (Pl.'s Mem. Opp'n 25-26; Pl.'s App. Exs. 3, 33-37.) Plaintiff's contention is unfounded.

- **January 2, 2012 Mass Email Complaint**

As referenced earlier, although informal complaints can be deemed "protected activity," the simple fact that a complaint concerns civil rights violations does not automatically render that complaint

---

[25] Assuming *arguendo* Plaintiff could establish a causal connection and therefore a *prima facie* case, Defendant provided a reasonable, non-retaliatory explanation for the comment at the end of Kane's voicemail.  Aside from the fact that Plaintiff has failed to show but-for causation or pretext, she has not established the existence of the "list" or that it had anything to do with her.

[26]   Equally significant, is the fact that Title VII's retaliation provision only protects individuals from retaliation that produces a significant injury or harm. *Burlington*, 548 U.S. at 67-68. The record herein is devoid of any evidence to demonstrate that the voicemail relied upon by Plaintiff in support of her retaliation claim resulted in harm.

protected. "[I]t [is] perfectly appropriate to limit the protections of Title VII to employee behavior that is reasonable, as determined by balancing the interests of the employee in opposing unlawful discrimination with those of the employer in maintaining a productive workplace." *Sampath,* 2008 U.S. Dist. LEXIS 25715, at *136.

In this case, Plaintiff's January 2, 2012 mass email complaint does not constitute protected activity. First, said complaint concerned Kane's voicemail and the "list," which has already twice proven itself to be a non-issue. (Pl.'s App. Ex. 33.) Second, the email concerned issues internal to the union and was sent exclusively to union personnel, not to Defendant. (Pl.'s App. Ex. 33.) The purpose of the email was twofold: (1) to inform other union members of the alleged existence of the "list" mentioned by union vice-president Kane at the end of his voicemail; and, (2) to solicit information about that "list" from union members. (Pl.'s App. Ex. 33.) The email also broadcasted Plaintiff's discontent about the union's alleged failure to protect the interests of dues-paying union workers and although it hinted at discrimination in passing, it does not implicate Defendant. (Pl.'s App. Ex. 33.)

Title VII's anti-retaliation provision protects individuals who engage in activity described by either its opposition clause or its participation clause. This includes individuals who "*opposed* any … unlawful employment practice" or "made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a) (emphasis added). Inasmuch as Plaintiff's mass email complaint opposed union practice and not Defendant's "employment practice," it is not protected under the opposition clause vis-à-vis Defendant. *Id.* And, although the participation clause is interpreted as providing broad and liberal protection, it has a threshold requirement that a "plaintiff allege in the charge that his or her employer violated Title VII by discriminating against him or her on the basis of race, color, religion, sex, or national origin, in any manner." *Slagle v. Cty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006). Again, Plaintiff's email haphazardly hints at age, gender, and

race discrimination, but it does not implicate Defendant. (Pl.'s App. Ex. 33.) As such, said email is not protected under the participation clause, either, vis-à-vis Defendant.

Moreover, if Plaintiff could establish her January 2, 2012 mass email complaint was a protected activity, without more, three months' separation is not particularly suggestive of a causal link in the context of this case. *See* Kachmar, 109 F.3d at 178 (emphasizing the importance of context in retaliation causation inquiries) *and Rosati*, 94 F. Supp. 3d at 717 (finding months not particularly suggestive).

Further, if Plaintiff could establish a causal connection, her *prima facie* case would not be covered by Title VII.  Plaintiff's January 2, 2012 mass email complaint was sent to union members and she furnishes no evidence to show that Kimberly-Clark management received that email.  The record only demonstrates Defendant learned of Plaintiff's mass email after receiving "disgusted feedback" from employees who received the email.  (Pl.'s App. Ex. 33.)  Because Plaintiff has not shown that Defendant received the email, she has not shown that Defendant had any knowledge of the specific contents of the email. Thus, even if Plaintiff could show a causal link between her January 2, 2012 mass email complaint and her March 20, 2012 termination, she would only be establishing a *prima facie* case of retaliation against her disruptive, inappropriate use of email, not against the allegedly protected contents of the email.  Her *prima facie* case, therefore, would not be covered by Title VII. *See* Moore, 461 F.3d at 342 ("'[I]f the reason for [the adverse action] is one that is not proscribed by Title VII, it follows that Title VII provides no relief.'") (quoting *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir.2006)).

- **February 8, 2012 Group Email Complaint**

In assessing Plaintiff's next contention, this Court remains cognizant of the fact that while protected complaints may be informal, they may not be so vague that they are not constructive.  *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) ("A general complaint of unfair treatment is insufficient to establish protected activity under Title VII" and

"[o]pposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context."). "Complaints must be specific enough to notify management of the particular type of discrimination at issue in order to constitute protected activity." *Mikell*, 789 F. Supp. 2d at 611.

Plaintiff's February 8, 2012 group email complaint satisfies the opposition clause's threshold requirement because it contains allegations of Title VII violations by Defendant. *Slagle*, 435 F.3d at 268. It also satisfies *Curay-Cramer*'s specificity requirement and therefore potentially qualifies as protected activity under Title VII's participation clause. (Pl.'s App. Ex. 35.) However, without more, the temporal separation of one and one-half months is not particularly suggestive of a causal link. *See Kachmar*, 109 F.3d at 178 (emphasizing the importance of context in retaliation causation inquiries); *Rosati*, 94 F. Supp. 3d at 704 (finding months not particularly suggestive).[27]

- **ECAPS Complaints**

With respect to Plaintiff's ECAPS complaints, based on other entries shown in the ECAPS reports,[28] it is clear that the ECAPS system is intended to be used to address facilities, safety, and

---

[27]  This Court is mindful of the varying scopes of time presented in support of Plaintiff's temporal proximity arguments and the fact that several years is generally viewed less probative than several days, weeks, or months.  However, to rely *solely* upon the mere span of time involved here, would be to ignore the continuation of Plaintiff's insubordination that has been demonstrated by Defendant via extensive evidence of record.

[28]  *See* January 20-23, 2012 Weekend Summary of ECAPS Events, Pl.'s App. Ex. 34. Report entries include: "Eye Wash Station blocked," "Fan bearing failed," "Air Hose Nozzle is missing," "Unsecured door – broken lock," and "shower stall drains are plugged." The brief description in Plaintiff's January 20, 2012 entry reads "I feel it is unsafe working under conspiracy and discrimination." The detailed description repeats this sentence and adds "let the company honor their May 25, 2011 agreement and let a court decide."  *See also* March 5-6, 2012 Weekend Summary of ECAPS Events, Pl.'s App. Ex. 36. Report entries include: "Hard hat signage," "5 Pulper leaking stock/water to sewer system," "manifold valve leaking to sewer," "roll fell off pallet," "Gate left open and unlocked or attended [sic]," "High volume of water going to sewer," "Gas has been increased to maintain Total DP less than 65 inches," "Flash Fold Doors," "bent crane arm," "PARENT ROLL CRANE J HOOK BENT," and "DOOR BROKEN WILL NOT CLOSE." The brief description in Plaintiff's March 5, 2012 entry reads "We need to call OSHA[.] Safety should be number one." The detailed description of her entry reads "It is

maintenance issues.  Plaintiff's use of the ECAPS system to communicate discontent regarding personnel issues is, therefore, out of place and inappropriate.  "[P]oor judgment" in an employee's chosen means of opposition can render the opposition "not covered" by Title VII.  *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 539 F. Supp. 437, 451 (W.D. Pa. 1982).

Plaintiff's ECAPS complaints are also devoid of the specific information needed to be constructive. Lastly, Plaintiff's ECAPS complaints express a desire to be terminated and to engage in litigation. Because Plaintiff's ECAPS complaints are vague and display poor judgment, they are "not covered" by Title VII. *See Curay-Cramer*, 450 F.3d at 135 *and Novotny*, 539 F. Supp. at 451.

Even assuming these complaints were protected activity, Plaintiff's January 20, 2012 ECAPS complaint is not sufficiently proximate to her March 20, 2012 termination to suggest a causal link by temporal proximity. Plaintiff's March 5, 2012 ECAPS complaint, although potentially close enough to her March 20, 2012 termination to suggest a causal link by temporal proximity *when considered in isolation*, is the second to last complaint in a series of no less than thirteen related complaints registered over the course of approximately three years.[29] Taken in context, the final events of Plaintiff's employment do not infer retaliation, but rather, the natural end of a deteriorating relationship between an employee and her employer. *See Kachmar*, 109 F.3d at 178 (emphasizing the importance of context in retaliation causation inquiries).

- **March 12, 2012 Email Threat**

The most temporally proximate activity alleged by Plaintiff—her March 12, 2012 email—is not only vague, but coercive toward members of the Human Resources department. (Pl.'s App. Ex. 37.)

---

unsafe for me and the people I have to work with under your retaliation, conspiracy and fraud honor your May 25 agreement and let a court decide, or lets [sic] ask OSHA should I have to work unsafe [sic] and in the line of fire? And do not slander my name."

[29] The series consists of two (2) EEOC Charges of Discrimination, three (3) internal grievance forms, four (4) emails, two (2) company hotline complaints, and two (2) ECAPS complaints.

Because this means of opposition clearly reveals "poor judgment" by Plaintiff and is not specific, it does not qualify as a protected activity. Accordingly, this Court need not reach the question of causal link by temporal proximity with regard to same and Plaintiff once again fails to establish a *prima facie* case of retaliation under Title VII.

### 5. Miscellaneous Considerations

When, as here, a court finds no unusually suggestive temporal proximity between allegedly protected activities and adverse actions, it should "consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels v. Sch. Dist. of Philadelphia,* 776 F.3d 181, 196 (3d Cir. 2015). Plaintiff does not proffer— and this Court does not find— any evidence of record to show antagonism, inconsistency, or retaliatory animus on the part of Defendant. On the contrary, viewing the circumstances as a whole, the record shows Defendant displayed discretion, patience, and even-handedness in its treatment of Plaintiff and was consistent in explaining its actions. Because Plaintiff fails to establish a *prima facie* case of retaliation under Title VII, Defendant is entitled to summary judgment with respect to her Title VII retaliation claim.

### iii. Defendant's Rebuttal

Even if Plaintiff could establish a *prima facie* case of retaliation under Title VII, Defendant satisfies its burden of articulating non-discriminatory reasons for Plaintiff's adverse actions. Defendant asserts Plaintiff received the five-day suspension for insubordination because she failed to comply when subpoenaed to attend the Horne arbitration. (Def.'s Mem. Supp. 2, 3; Pl.'s App. Ex. 40.) Defendant further asserts Plaintiff received the fifteen-day suspension, demotion, and Last Chance Agreement for making false and inaccurate statements in a Code of Conduct complaint and in the resulting

37

investigation.  (Def.'s Mem. Supp. 27; Pl.'s App. Ex. 28.)  Finally, Defendant submits Plaintiff's

employment was terminated for disruptive behavior in the workplace and for violations of her Last

Chance Agreement.  (Def.'s Mem. Supp. 27; Pl.'s App. Ex. 3.)  Specifically, Defendant submits Plaintiff

drained company resources by reiterating allegations of discrimination that had already been

investigated, disrupted other employees by sending mass emails, and attempted to intimidate

Defendant's Human Resources employees.  (Def.'s Reply 10; Pl.'s App. Exs. 33, 37.)  By articulating

these reasons and demonstrating their validity through evidence of record, Defendant satisfied its burden

of production under the *McDonnell Douglas* framework.

### iv.    Pretext with But-For Causation

If Plaintiff could establish a *prima facie* case of retaliation under Title VII, she would also have

the burden to show pretext in response to Defendant's rebuttal. As discussed above, to prove causation

at the pretext stage, the plaintiff must show she would not have suffered the adverse action "but for" her

protected activity. *Young*, 651 F. App'x at 96 (signaling *Nassar*, 133 S. Ct. at 2533.) "Courts routinely

have applied *Nassar* at the summary judgment stage, and have granted judgment in favor of the

employer where the plaintiff's [adverse action] would have occurred regardless of any alleged retaliatory

motive." *Costa v. Pa. Dep't of Revenue*, Civ. No. 12-854, 2014 U.S. Dist. LEXIS 38952, at *39 (W.D.

Pa. Mar. 25, 2014).

In attempting to show pretext, Plaintiff makes one "but for" causation argument; namely, that she

would not have been terminated but for the fact that she engaged in the allegedly "protected activity" of

sending the aforementioned emails.  (Pl.'s Mem. Opp'n 26.)

Preliminarily, this Court finds that because Plaintiff's sole pretext argument concerns only her

termination and she makes no attempt to establish pretext or "but for" causation with respect to any prior

adverse action, she has waived any claim of retaliation concerning adverse actions occurring prior to her

termination.

With respect to Plaintiff's assertion that she would not have been terminated "but for" the fact that she sent emails complaining of discrimination, she fails to show "but for" causation. Plaintiff is correct that Defendant asserted Plaintiff's email activity as one reason for her termination.  However, in doing so, Defendant specifically cited her mass email and her threatening email directed to Human Resources – neither of which is a protected activity.[30]  (Def.'s Reply 10.)  Title VII only prohibits the imposition of adverse actions in response to protected activity.  *See Moore*, 461 F.3d at 342 ("[I]f the reason for [the adverse action] is one that is not proscribed by Title VII, it follows that Title VII provides no relief.").  Furthermore, Defendant has articulated—and provided evidence of record to demonstrate— other legitimate reasons for Plaintiff's discharge that were unrelated to her email complaints.  (Def.'s Reply 10.)  Thus "[P]laintiff's [adverse action] would have occurred regardless of any alleged retaliatory motive."  *Costa*, 2014 U.S. Dist. LEXIS 38952, at *39.

Again, considering the broader context, Defendant's actions evince not retaliation but patience in dealing with more than a dozen complaints submitted over the course of several years.  *See Kachmar v.*, 109 F.3d at 178 (emphasizing the importance of context in retaliation causation inquiries).  Defendant's commitment of no less than four employees to the task of conducting multiple investigations in response to Plaintiff's complaints demonstrates respect for the seriousness of the issues.  Defendant's actions in allowing Plaintiff to continue working after she refused to sign the Last Chance Agreement further demonstrates Defendant's reluctance to terminate a loyal employee.

### C.     Race Retaliation under 42 U.S.C. § 1981

While 42 U.S.C. § 1981 does not expressly refer to retaliation, the Supreme Court has affirmed courts' construal of § 1981 as prohibiting retaliation. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446-

---

[30] *See* section VI.B.ii.b.4, *supra*, "January 2, 2012 Mass Email Complaint" *and* "March 12, 2012 Email Threat."

57 (2008). However, as a threshold matter, the plaintiff must demonstrate that there has been an underlying § 1981 race discrimination violation in a § 1981 retaliation case. *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010). *See also Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 753 (E.D. Pa. 2014) (same); *Johnson v. Labor Force, Inc.*, Civ. No. 10-199, 2011 U.S. Dist. LEXIS 144766, at * 15-16 (E.D. Pa. Dec. 15, 2011) (same).  Because Plaintiff has failed to establish an underlying § 1981 race discrimination violation in this case, her associated claim of retaliation is foreclosed and Defendant is entitled to summary judgment on said claim.

## V.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment shall be granted in its entirety.

An appropriate Order follows.

BY THE COURT:

/s/  C. Darnell Jones, II    J.

40